Brian T. McCarthy (BM 4808)
Wayne A. Parker (WP 6661)
CHALOS, O'CONNOR & DUFFY LLP
366 Main Street
Port Washington, New York 11050
Tel: (516) 767-3600
Fax: (516) 767-3605

JUDGE KOELTL

10 CIV 6448

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------X
SWIFT SPLASH LTD.
                         Petitioner,

                                                      10 CV _____

     - against -

THE RICE CORPORATION, d/b/a
THE RICE COMPANY
                         Respondent.
------------------------------------------------------X

## PETITION FOR AN ORDER TO SHOW CAUSE FOR AN ATTACHMENT IN AID OF ARBITRATION

Petitioner Swift Splash Ltd., (hereinafter "Petitioner" or "Swift Splash"), by and through its attorneys, Chalos, O'Connor & Duffy LLP, alleges as and for its Petition against Respondent, The Rice Corporation, d/b/a The Rice Company (hereinafter "Respondent" or "TRC"), as follows:

### INTRODUCTION

1.     This is an action for an Order to Show Cause for an Attachment in Aid of an Arbitration action currently pending before the London Maritime Arbitrators Association (hereinafter "the pending arbitration"). In the pending arbitration, Petitioner seeks to recover money damages for breach of a time charter party agreement dated September 5, 2007 (hereinafter "the Charter Party"), including sums owed to Swift Splash as a result of TRC's

repudiation and unjustified cancellation of the Charter Party and redelivery of the vessel M/V "SWIFT SPLASH" (the "Vessel") 301 days early.

2. TRC has steadfastly refused to pay Swift Splash the sums owed and has asserted counterclaims.

3. Swift Splash has brought counterclaims in the pending arbitration against TRC to recover the above mentioned damages and its enforcement costs and fees, as provided for in the Charter Party.

4. Swift Splash has located property belonging to TRC in banks within this District.

5. This Petition seeks, by Order to Show Cause, an order for attachment, pursuant to Rule 64 of the Federal Rules of Civil Procedure and Articles 62 and 75 of New York's Civil Practice Law and Rules (hereinafter "C.P.L.R."), attaching TRC's bank accounts up to $4,726,848.99,[1] so that the award to which Swift Splash is entitled in the pending arbitration will not be rendered ineffectual.

## THE PARTIES

6. Petitioner is a corporation organized and existing under the laws of Liberia with a registered office in Monrovia, Liberia.

7. TRC is a corporation organized and existing under the laws of Delaware with its principal place of business in Roseville, California. TRC has also registered itself in New York as a foreign business corporation.

---

[1] This figure is the sum of unpaid hire payments due and owing at the time of TRC's breach of the Charter Party (i.e., $837,848.99) and $3,889,000 in loss profits as a result of TRC's breach of the Charter Party.

2

## JURISDICTION AND VENUE

8. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1332 and 9 U.S.C. § 203.

9. Venue is appropriate in this District pursuant to 28 U.S.C. § 1391(a)(2) and 9 U.S.C. § 204.

## FACTUAL BACKGROUND

### The Charter Party's Relevant Provisions

10. Swift Splash, as owner, and TRC, as charterer, entered into a time charter party concluded on an amended NYPE form dated September 5, 2007, wherein TRC agreed to charter the Vessel from Swift Splash. A copy of the Charter Party is attached hereto as Exhibit A.

11. Clause 37 of the Charter Party required hire payments to be made by TRC in the amount of Twenty-Five Thousand Five Hundred United States Dollars (US$25,500) per day[2] with payment to be made in full and without deductions by authenticated and valued dated SWIFT/Telegraphic transfers. *See* Exhibit A at Clause 37.

12. The express terms of Clause 37 of the Charter Party also provided, *inter alia*, that "…so long as full hire due less specifically agreed amount remains unpaid, [Petitioner] will be entitled to suspend performance of any and all of their obligations under this Charter Party, in port or at sea and shall have no responsibility for consequences directly arising therefrom and the hire shall continue to accrue…" *See* Exhibit A at Clause 68.

13. Clause 37 further provided that during the period of the Charter Party TRC had the right to deduct from charter hire any off hire time, provided that such off hire time was fully

---

[2] In the subsequent arbitral proceedings, the Petitioner and Respondent stipulated and agreed to reduce the charter hire rate to $21,000 per day.

supported by original vouchers. Clause 37 also stated that such deduction off hire time was always subject to Swift Splash's consent. *See* Exhibit A at Clause 37.

14. Clause 68 of the Charter Party further permitted TRC to terminate the Charter Party before the required redelivery date but only "If the vessel is **placed off-hire more than 30 (thirty) consecutive days**, unless by fault of the [TRC]..." *See* Exhibit A at Clause 68.

15. Clause 69 of the Charter Party additionally provided for arbitration of "all disputes and differences arising out or under this contract which cannot be amicably resolved..." Such arbitration was to take place in London before a panel composed of arbitrators chosen from the London Maritime Arbitrators Association (hereinafter "LMAA"). Clause 69 provided that English law was the governing law of this contract and English law has been applied in all arbitral proceedings conducted pursuant to Clause 69. *See* Exhibit A at Clause 69.

16. By an e-mail received on September 27, 2007, TRC exercised its option under clause 34 of the Charter Party to extend the charter period to a minimum of twenty-four (24) months up with TRC's option to extend to twenty-six (26) months. As a result, the earliest redelivery date under the Charter Party became 1:00 PM on September 27, 2009.

17. On information and belief, TRC sub-chartered the Vessel to non-party TKB Shipping A/S (hereinafter "TKB") on materially back-to-back terms. TKB in turn sub-chartered the Vessel to non-party TPC Korea Co., Ltd. (hereinafter "TPC") on materially back-to-back terms.

## TRC's Unjustified Repudiation of the Charter Party

18.     For over one year, the Vessel undertook multiple voyages at the direction of TRC pursuant to the terms of the Charter Party and with no complaints about the Vessel's material condition.

19.     On August 2, 2008, the Vessel completed loading of a cargo of cement at Eleusis, Greece, for delivery at Hull, England.  During the voyage from Eleusis, Greece to Hull, England, the Vessel encountered severe heavy weather in the Bay of Biscay, including gale force winds and swells, which resulted in the Vessel shipping seas over her main deck and hatch covers. When the Vessel arrived at Hull on August 16, the master promptly issued a Note of Sea Protest as to the heavy weather.

20.     On August 22, 2008, the Petitioner informed TRC that the Vessel was off-hire due to the need to carry out hull cleaning.  Petitioner further notified TRC the Vessel would spend several days in Hull, then travel to Portland, England, to undergo the planned hull cleaning.

21.     Commencing August 22, 2008, surveyors acting at the request of TPC inspected the Vessel while she was berthed at Hull.  This inspection included a hose test undertaken on August 29-30 which revealed leaking in each of the Vessel's holds and other defects possibly caused by the heavy weather encountered en route to Hull on charterer's orders.  The Vessel thereafter proceeded to Portland, England to undergo the planned hull cleaning.  The anticipated cleaning of the Vessel's hull was completed while the Vessel was docked in Portland, and on September 7, 2008, Petitioner informed TRC that the Vessel was back on hire and available again for trade and awaiting TRC's or its sub-charterers' orders.

22. From September 7, 2008 to September 15, 2008, the Vessel was on hire in Portland and was awaiting orders from TRC. Petitioner sent several messages to TRC noting that the Vessel was low on fresh water and would need to travel to Brixham to replenish. TRC sent a message to Petitioner on September 15 ordering the Vessel to proceed to Ventspils, Latvia, to load a bulk cargo of urea. That same day the Vessel proceeded to Brixham to load fresh water before commencing the voyage to Ventspils.

23. On September 16, the Vessel departed Brixham for Ventspils pursuant to TRC's orders sent the previous day. The Vessel arrived at the anchorage in Gothenberg, Sweden, where she took on bunker fuel on September 19. The Vessel then proceeded to Ventspils where she anchored on September 21.

24. The next day, September 22, TRC ordered the Vessel to proceed to her berth at Ventspils, which orders the Vessel immediately followed tying up at the designated berth that afternoon.

25. From September 22, 2008 to September 25, 2008, the vessel remained at the berth at Ventspils. The vessel was on hire from September 7, 2008 to September 25, 2008.

26. On September 25, another hose test was conducted on the Vessel's hatches prior to the anticipated loading of the cargo of urea. This hose test revealed the hatch covers for all but one of the Vessel's holds were leaking. The hose test results were immediately communicated to all parties. TRC subsequently sent a message to the Petitioners alleging the Vessel was unseaworthy and asserting that Petitioner was liable for the unseaworthy condition of the Vessel.

27. On September 26, Petitioner communicated to TRC that the Vessel would immediately depart from Ventspils and proceed to Klaipeda to undertake repairs to the hatch covers. TRC issued no further orders for the Vessel despite repeated reminders by the Petitioner that the Vessel was in Ventspils and awaiting instructions in light of the pending repairs.

28. When the vessel attempted to depart from Ventspils on September 26, 2008, TRC's agents, Seastar Agency, prevented the Vessel from departing. Seastar Agency refused to allow the Vessel to depart Ventspils until TRC paid Seastar Agency's outstanding invoices for services rendered and disbursements made by TRC's agent. Petitioner immediately informed TRC that its agent was preventing the vessel from departing from Ventspils.

29. In response, TRC acknowledged it was solely responsible for the debts owed to Seastar Agency and stated that TRC would make all required payments to its agent to ensure the vessel could depart from Ventspils.

30. Upon information and belief, TRC failed to abide by its response as Seastar Agency continued to prevent the Vessel from departing Ventspils for three (3) days.

31. Petitioner protested to TRC that such delays were not due to Petitioner's actions and were solely the result of TRC's failure to pay a debt to its own agent.

32. Petitioner asserted that TRC could not claim the Vessel was off-hire due to hatch cover damage as the vessel was being detained in Ventspils as a result of TRC's failure to pay its own agent.

33. The Vessel was permitted to depart Ventspils on the afternoon of September 29, 2008, and she proceeded to the repair yard at Klaipeda. The repairs to the hatch covers were completed on October 19, 2008, with the hatch covers being certified to be weather/leak tight by

the Vessel's classification society, Lloyd's Register, the representatives of both Petitioner's and TRC's protection and indemnity marine insurance clubs and a representative from MacGregor (GBR) Ltd.

34. While the Vessel was undergoing repairs at Klaipeda, TRC sent a message to Petitioner on October 15, 2008, purporting to cancel the Charter Party pursuant to clause 68 and/or for the Petitioner's alleged repudiatory breach, which alleged breach was and is denied. TRC's notice was also sent to TCP and requested clarification from TPC as to how TPC justified termination under clause 68 of its relevant charter party since the same clause required the Vessel to be off-hire for over 30 consecutive days.

35. Petitioner rejected TRC's notice outright and asserted the Charter Party remained in place and effect.

36. On October 17, 2008, TRC acknowledge Petitioner was correct, admitted the Charter Party remained in place and effect and that TRC's notice of October 15, 2008 had been revoked. Specifically, TRC affirmed the effectiveness of the Charter Party on October 17, 2008, and noted that it had no right under clause 68 to terminate the Charter Party because "**the 30 running days didn't happen yet.**" TRC further stated that Petitioner should continue to take formal instructions from either TPC or TKB as to where to proceed upon leaving the repair dock.

37. On October 22, 2008, Petitioner sent notice to TRC that the Vessel was back on-hire and awaiting TRC's orders. As of this date, the Vessel had been off-hire for a period of 23 consecutive days (i.e., from September 29 thru October 22).

38. On October 22, 2008, TRC repeated its instructions of October 17, 2008, that Petitioner accept written orders from either TPC or TKB and that the master communicate directly with TPC.

39. On October 22, 2008, TRC sent another message purporting to cancel the Charter Party pursuant to clause 68.

40. Petitioner immediately rejected TRC's unjustified termination of the Charter Party sent on October 22.

41. As TRC refused to perform as required under the Charter Party, Petitioner mitigate its damages and chartered the Vessel to other parties at the then-prevailing and, it should be noted, lower market rate for charter hire.

42. As s direct result of TRC's unjustified termination of the Charter Party, Petitioner incurred actual and consequential damages in the amount of $4,726,848.99, including unpaid hire and loss of profits.

### The Pending Arbitration

43. Pursuant to Clause 69 of the Charter Party and the LMAA's procedures, TRC filed a "Claims Submission" with the LMAA. A copy of TRC's Claims Submission is attached hereto as Exhibit B.

44. In its Claim Submission, TRC alleged Swift Splash breached the Charter Party by having the vessel off hire for more than thirty (30) consecutive days.

45. TRC also admitted in its Claim Submission that it repudiated the Charter Party.

46. Petitioner filed its "Defence and Counterclaim Submission" on June 5, 2009, denying any alleged breach of the terms of the Charter Party. A copy of Petitioner's Defence and Counterclaim Submission is attached hereto as Exhibit C.

47. Petitioner further asserted counterclaims arising from TRC's unjustified repudiation of the Charter Party in the amount of $837,848.99 for unpaid hire at, the time of the breach by TRC, in addition to $7,675,500.00 in charter hire payments that were due and owing from TRC, after TRC breached the Charter Party.

48. Subsequent to its submission of the Defence and Counterclaim Submission, Petitioner conducted a second review of its records to confirm the damages incurred due to TRC's repudiation of the Charter Party. That review took into account the Petitioner's mitigation efforts, i.e. the hire payments from those charterers who chartered the Vessel after TRC's repudiation through the duration of the original charter period. Taking these mitigating hire payments into account, the Petitioner's damages are currently calculated to be in the amount of $4,726,848.99. Petitioner's damages are set forth in greater detail in Exhibit D attached hereto.

## PETITION FOR AN ORDER TO SHOW CAUSE FOR AN ATTACHMENT IN AID OF ARBITRATION PURSUANT TO RED. R. CIV. P. 64 AND CPLR ARTICLES 62 AND 75

49. Both parties have submitted defenses to the opposing party's submission or counterclaims and the arbitration proceeding is expected to go forward in the next several months.

50. Respondent commenced the Arbitration by filing a Claims Submission dated March 27, 2009. Petitioner responded with its own "Defence and Counterclaim Submissions" on

June 5, 2009. Hence, Petitioner is asserting a cause of action within the meaning of CPLR 7502(c) and 6212(a).

51. As more fully set forth in the Memorandum of Law filed in support of the Petition, Petitioner's case is clearly the stronger under English law, the applicable law of the contract. Respondent's *sole* justification for repudiating the Charter Party rests on its assertion that the Vessel was off-hire for more than thirty (30) days as required under Clause 68 for Respondent's right to terminate the Charter Party. However, Respondent cannot possibly demonstrate the Vessel was off-hire in excess of 30 days, as they have already admitted they had no right under clause 68 to terminate the Charter Party because "**the 30 running days didn't happen yet.**" Petitioner has therefore satisfied the requirement that it will be successful on the merits of the arbitration action and be awarded damaged in the amount of $4,726,848.99, plus interest and costs, for breach of the Charter Party.

52. In its Claims Submission, Respondent asserted counterclaims in the amount of $550,112.12. Assuming these claims are just, which Swift Splash denies, they are far smaller than Petitioner's legitimate claims for $4,726,848.99 arising solely from the Respondent's unjustified repudiation and breach of the Charter Party. Hence, Petitioner's claims against Respondent easily exceed all known counterclaims that Respondent could assert in good faith during the pending arbitration.

53. Respondent has refused to pay charter hire payments that it knows are due to Petitioner. Moreover, Respondent has a well-documented history of breaching charter agreements and other maritime contracts, that required the opposing party to file attachment actions against TRC. From 2000 thru 2008, Respondent was named as a defendant in six (6)

separate Supplemental Rule B attachments actions filed in this Court.[3] In each of these six (6) Supplement Rule B attachment actions, the plaintiffs were seeking to obtain security for breaches of Charter Parties by TRC. TRC has a significant history of breaching Charter Parties and other maritime contracts, failing to post security for these claims and therefore an attachment is necessary in the instant matter avoid any award in Petitioner's favor being rendered ineffectual by TRC's refusal to pay the award.

54. After months of investigation, Petitioner has located two bank accounts belonging to TRC in this District. Petitioner has confirmed a business banking relationship between HSBC Bank USA, N.A. (hereinafter "HSBC Bank") and TRC. When calls were placed to HSBC Bank, the bank representatives stated that a search of their system, utilizing TRC's name and its Federal Employment Identification Number, identified a savings account with a current balance of approximately $7,321,250.73. HSBC Bank is located in this District at 452 5th Avenue, New York, New York. Petitioner has confirmed a business banking relationship between Wells Fargo and TRC. When calls were placed to Wells Fargo, the bank representatives stated that a search of their system identified a commercial checking account maintained by TRC at Wells Fargo. This account is accessible through Well Fargo's office at 12 East 49th Street, New York, New York 10017.

55. Given Respondent's past record of refusing to comply with the Petitioner's demands for payment of due charter hire and its documented history of a need to obtain security to satisfy arbitration awards, the Respondent will undoubtedly resist enforcement of any arbitral

---

[3] These actions include: (1) *Marine Trading Ltd. v. The Rice Company*, S.D.N.Y. Index No. 00-cv-5835(GEL); (2) *Allied Maritime, Inc. v. The Rice Corporation*, S.D.N.Y. Index No. 04-cv-7029(SAS); (3) *Silver Streams Ltd. v. The Rice Company*, S.D.N.Y. Index No. 05-cv-6662 (VM); (4) *Mur Shipping B.V. v. The Rice Company*, S.D.N.Y. Index No. 08-cv-4358(TPG); (5) *Daeyang Shipping Co. Ltd. v. The Rice Company*, S.D.N.Y. Index No. 08-cv-9819(CM); and, (6) *Glory Wealth Shipping Services Ltd. v. The Rice Company*, S.D.N.Y. Index No. 08-cv-10245 (NRB).

award issued by the LMAA panel to which Petitioner may be entitled in the pending arbitration, including removing funds in the aforementioned account. These actions would preclude the enforcing of an arbitral award issued in the instant matter.

56. Petitioner seeks an order of attachment in aid of the pending arbitration, attaching the accounts discussed above up to the amount of $4,726,848.99, which is the amount Petitioner seeks in the pending arbitration. An attachment order issued by this Court will ensure that any award issued by the LMAA panel in favor of Petitioner will be satisfied and not rendered ineffectual.

WHEREFORE, Petitioner Swift Splash Ltd. respectfully requests that this Court, by Order to Show Cause and pursuant to CPLR 7502(c) and Article 62, as incorporated by Rule 64 of the Federal Rules of Civil Procedure, issue an Order directing the attachment of Respondent TRC's assets at HSBC Bank and Wells Fargo, in the amount of $4,726,848.99.

Dated: Port Washington, New York
August 30, 2010

                CHALOS, O'CONNOR & DUFFY LLP,
                Attorneys for Petitioner
                Swift Splash Ltd.

By:   */s/ Wayne A. Parker*
        Brian T. McCarthy (BM 4808)
        Wayne A. Parker (WP 6661)
        366 Main Street
        Port Washington, New York 11050
        Tel: (516) 767-3600
        Fax: (516) 767-3605