UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------X

SWIFT SPLASH LTD.,                                    Index No.

                                    Petitioner,       10 CIV 6448(JGK)

        — against —

THE RICE CORPORATION, d/b/a
THE RICE COMPANY INC.,

                                    Respondent.
----------------------------------------------------------X

### DECLARATION OF KEITH B. DALEN, ESQ. IN OPPOSITION TO PETITIONER'S REQUEST FOR AN ATTACHMENT

KEITH B. DALEN, declares under penalty of perjury as follows:

1.      I am a Member of the law firm of Hill Rivkins LLP, attorneys for Respondent, The Rice Corporation d/b/a The Rice Company (hereinafter "TRC").  I make this declaration in opposition to the Petitioner's request for an attachment under Civil Practice Law and Rules Articles 62 and 75.

2.      The funds sought to be attached currently reside in an escrow account which was set up through an agreement with a third party vessel owner.  The account was created when cargoes aboard the vessel were discharged at the orders of TRC without the presentation of original bills of lading.  In order to protect the vessel owner from any claims by the holder of the bills of lading—who had wrongfully refused to accept the cargo—TRC issued a letter of indemnity and deposited the funds into the escrow account.  Access to the account can only be obtained by written authorization of

1

both the attorneys for TRC and the attorney for the vessel owner.  As a result, TRC has neither access to nor control of the funds in the account.  The vessel owner has an interest in the funds in the account.

3.      Attached hereto as Exhibit 1 is the declaration and exhibits of Clare Fenella Tookey, solicitor for TRC in the London arbitration initiated by TRC against Swift Splash, Ltd.

4.      Attached hereto as Exhibit 2 is the declaration of Manish Bhapkar, Freight & Logistics Manager of TRC.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on:

7 September 2010

KEITH B. DALEN

# EXHIBIT 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------x

SWIFT SPLASH LTD                                          **10-CIV-6448**

                              Petitioner

     against


THE RICE CORPORATION, d/b/a
THE RICE COMPANY

                              Respondent
-------------------------------------------------------------------x


## DECLARATION OF CLARE FENELLA TOOKEY


I, Clare Fenella Tookey, of Milburn House, 35 Dean Street, Newcastle-upon-Tyne, NE1 1LE, United Kingdom, hereby declare and say the following under penalty of perjury:

1.      I am a solicitor of the Supreme Court of England and Wales at Mills & Co, a law firm, of the above address.

2.      This Declaration will refer to the Petitioner as "Swift Splash" and to the Respondent as "TRC".

3.      I submit this Declaration in support of a request to reject Swift Splash's Petition for an Order to Show Cause for an Attachment in Aid of Arbitration against TRC.

355543.1

4.      I act for TRC in the London arbitration commenced by TRC against Swift Splash.   I receive my instructions from TRC's insurer, RaetsClub Marine Insurance B.V. (hereinafter "RaetsClub").  Raetsclub is supporting TRC's claim in the London arbitration.

5.      Where the facts and matters to which I refer are within my own knowledge, they are true.  Where they are not within my own knowledge, they are true to the best of my knowledge and belief, being derived from documents in my possession and my conduct of the matters generally, and from documents and information supplied to me by RaetsClub.

6.      Swift Splash submits in the Petition and in the Memorandum of Law in Support of the Petition that it has the greater likelihood of success on the merits in the London arbitration.  This Declaration refutes Swift Splash's submission.

7.      As noted in the Declaration of Wayne A. Parker dated 3[0th] August 2010, TRC is the Claimant in the London arbitration; Swift Splash the Defendant/Counter-claimant.

8.      Swift Splash has provided this honourable Court with copies of submissions made in the London arbitration. The honourable Court is respectfully requested to note that submissions in the London arbitration are not yet closed; TRC will be making further written submissions, and it may be that Swift Splash will also seek to do so.

9.      Once submissions in the London arbitration have closed, the Tribunal will, following consultation with the parties, determine the timetable leading up to a hearing. This will include time for the disclosure process, which has not yet been undertaken.   It will also include the exchange of factual and expert witness statements.  The honourable Court will therefore perceive that the London arbitration

2

is at an early stage procedurally, and that a significant amount of evidence has not yet come to light, and accordingly has not been tested.

10.     TRC anticipates that at the disclosure stage Swift Splash will be compelled to disclose documents which relate to the vessel's unseaworthiness from the outset of the charterparty period (see paragraphs 54 and 55 below).

11.     I attach to this Declaration a paginated bundle of copy documentation **(Exhibit A)**. References to page numbers hereafter are references to the documents contained in Exhibit A.

12.     TRC takes issue with the allegations made by Swift Splash in the Defence and Counterclaim Submissions.

13.     TRC denies that Swift Splash is entitled to the alleged or any sums from TRC (and I refer to paragraph 59 below). On the contrary, Swift Splash is in fact liable to TRC for US$883,727.30, rather than for US$550,112.12, (as set out in the revised Final Hire Statement forwarded to Swift Splash's English legal representatives on 25th May 2010, and annexed hereto as **Exhibit B**).

**Swift Splash unable to demonstrate that it is likely to prevail upon the merits in the London arbitration**

14.     Contrary to the submissions made in the Petition and in the Memorandum of Law, TRC was not in breach of the Charterparty.

**Proper construction of the off-hire provisions and consequent termination provisions in the charterparty dated 5th September 2007**

14.     Swift Splash's case in the London arbitration hinges upon the proper construction of the off-hire provisions and consequent termination provisions in the charterparty dated 5th September 2007 (hereinafter "the Charterparty").  I refer to Swift Splash's submissions in the Memorandum of Law at pages 10-11.  Swift

3

Splash faces considerable difficulty in persuading the London arbitration tribunal to agree with its interpretation of the off-hire provisions.

15.     In the Charterparty, the usual wording of clause 15 of the NYPE 1946 form has been consciously amended with the usual reference to *"full working"* of the vessel having been deleted and replaced by a reference to the *"full use and disposition of the vessel".*

16.     This change of wording is also reflected in clause 59 (Deviation/Put back/Drydock) with the clause referring to the vessel being at the *"Charterers' full use and disposition".*

17.     This consciously-changed wording from *"full working"* to *"full use and disposition"* introduces a different test for off-hire from the usual position under charterparties on the standard NYPE 1946 form.

18.     The question whether TRC were deprived of the *"full use and disposition"* of the vessel raises a broader analysis than the question whether the *"full working"* of the vessel was prevented.

19.     When asking whether the *"full working"* of the vessel was prevented, it is logical to limit the enquiry to whether the vessel was capable of performing the service then required of her (providing it is a service usually required by charterers).

20.     However, when considering whether TRC was deprived of the *"full use and disposition"* of the vessel, it is necessary to consider:

(a)     whether the full use and disposition of the vessel was prevented and/or

(b)     whether TRC was able to exploit the earning potential of the vessel.

21.     For example, if charterers order the vessel on a ballast voyage to a loadport for the purposes of loading a cargo, and the vessel is in fact in such a poor condition that she will be rejected for loading when she arrives, then during the

4

ballast voyage:

(a)    the poor condition of the vessel has prevented its full use and disposition; the vessel cannot be fully used and cannot be said to be fully at the disposition of the charterers and/or;

(b)    charterers have not been able to exploit the earning potential of the vessel, because the voyage was a wasted exercise.

22.    Accordingly, in the present case, on the wording of the off-hire provisions as amended, the vessel would be off-hire in such circumstances, even if she might not be under the usual *"full working"* wording of clause 15.

## Application of the off-hire provisions in the Charterparty to the facts

23.    Swift Splash admits that the vessel went off-hire on 22nd August 2008, the date when the vessel's hatch covers were identified as leaking. This defect – which meant that TRC did not have the *"full use and disposition"* of the vessel – was not remedied by Swift Splash until after the notice of cancellation was served by TRC on 15th October 2008.

24.    Furthermore, there can be no doubt that the vessel was off-hire when she proceeded to Portsmouth under Swift Splash's orders.  TRC did not have the full use and disposition of the vessel while she was complying with Swift Splash's orders.

25.    The Master's message of 1st September 2008 (at page 47 of the attachments to the Claim Submissions) notifying TRC that the vessel was proceeding to Portsmouth for hull cleaning, made no reference to repairs to the vessel's leaking hatch covers.

26.    On 2nd September 2008, a message **[Exhibit A, RD 1]** was sent to the Master which stated (in part):

355543.1

*"If the hatch covers are in the same condition as found by Brown Atkinson on the evening of 30.8.08 they are not watertight and the vessel is unseaworthy. Further, in a Note of Protest issued by Titan to the Master on 16.8.08 they protested about water damage to cargo from apparently leaking ballast tanks. Charterers are not aware of any steps by Owners to investigate and repair this defect.*

*Charterers' potential future employment of the vessel is compromised by her current condition and Charterers reserve all of their rights.*

*Accordingly, Charterers require Owners to immediately provide evidence which shows the hatch covers and ballast tanks do not leak, or evidence of the repairs they will perform before the vessel returns to charter service. ...*

*The onus is on Owners to show that the vessel is in the condition as warranted in the charterparty and is fit for charter service. ...*

*Charterers await Owners' response and in the meantime reserve all of their rights."*

27.     On 4th September 2008, a message was sent to Swift Splash **[Exhibit A, page RD 2]** which stated:

*"Charterers understand from Owners the hull cleaning being undertaken in the Portland area will conclude on Sunday next. However, Charterers have received no proof from Owners the vessel is in a fit condition to continue charter service.*

*...*

*In the circumstances the Charterers have no way of knowing if the vessel is fit to trade. Charterers reserve all of their rights including but not limited to treat*

355543.1                                                6

*the vessel as off hire until Owners establish the vessel is fit to trade."*

28.    On 10th September 2008, a further message was sent to Swift Splash **[Exhibit A, RD 3]**:

> *"... we request to be given notice by Owners of any repairs they intend to carry out, other than minor temporary repairs, and we require the opportunity to inspect the vessel at that time. ... In the meantime, it is not clear to us whether the vessel can carry water sensitive cargo or is restricted to non-sensitive cargo such as scrap? In these circumstances we are looking to fix the vessel for any cargo as permitted under the charterparty, including water sensitive cargo, and we intend to conduct a hose test of the hatch covers, which Owners have not consented to at the next load port. However, if Owners consider this is inappropriate for any reason please would they clarify the position by return."*

29.    Swift Splash never informed TRC that the vessel was not fit to carry water-sensitive cargo. However, as is common ground (see paragraph 16 of Swift Splash's Defence and Counterclaim Submissions) Swift Splash did insist that TRC gave voyage instructions to the vessel.

30.    In response to Swift Splash's pressure for voyage instructions, TRC fixed the vessel to carry a cargo of bulk urea from Ventspils in Latvia. Urea is a water-sensitive cargo.

31.    The vessel sailed for Ventspils on about 16th September 2008 and arrived there on 21st September 2008.

32.    After the vessel arrived at Ventspils, a hose test was performed and the hatch covers of all but one of the holds were found to be leaking.

33.    By a message dated 25th September 2008 **[Exhibit A, RD 4]**, Swift

7

Splash was held liable for the unseaworthiness of the vessel:

> "[Charterers] reserve all of their rights arising from Owners' breaches of charter, and require Owners to confirm by return whether or not they will repair the hatch covers so they are watertight and the ship is seaworthy, and if so when this will be? This information is required so that Charterers can know if the vessel can perform the urea fixture or if it can be employed any further at all under the charter.
>
> Owners will appreciate that time is of the essence in view of the urea fixture for the vessel, and Charterers give notice that they reserve the right to claim any losses or damages they incur if that fixture is not performed by reason of Owners' breaches of charter."

34.   On 26th September 2008, the charterers under the urea fixture cancelled **[Exhibit A, RD5]**.

35.   On 27th September 2008, Swift Splash ordered the vessel to sail from Ventspils, apparently in order to perform repairs.

**Off-hire: analysis**

36.   TRC denies that, after the vessel went off-hire at the latest on 22nd August 2008 (as is now common ground), she came back on hire on 7th September 2008 or at all. The vessel did not come back on hire thereafter as Charterers never had the "full use and disposition" of the vessel. TRC's final hire statement has been amended to show the correct position as a matter of English law (see paragraph 13 above, and **Exhibit B**).

37.   During the voyage to Ventspils, the vessel was off-hire within the meaning of clause 15. TRC was not able to exploit the trading potential or earning capacity of the vessel during this period because the vessel was not fit to load her

8

intended cargo, nor was she capable of being made fit before that cargo was cancelled. The vessel could not be fully used nor was she fully at TRC's disposition. The unfitness to load was caused by *"breakdown or damages to hull, machinery or equipment"*, namely the defective condition of the hatch covers.

38.     In effect, the vessel was off-hire and/or withdrawn from TRC's service and/or her full use was prevented and/or she was not at TRC's full disposition from when the hatch covers were found to be leaking on or before the 22nd August 2008, or alternatively when she sailed for Portsmouth for hull cleaning.  Whatever was done off Portsmouth did not return the vessel to a seaworthy condition nor did it enable the vessel to be fully used or fully at TRC's disposition. Nevertheless Swift Splash called for voyage instructions. TRC gave voyage instructions which ended in the intended fixture being cancelled (as was inevitable given the condition of the hatch covers), and the vessel was once more ordered to repair by Swift Splash.

39.     Furthermore, Charterers rely in this regard on the reported English law court case, The "TS Singapore" [2009] 2 Lloyd's Rep 54, in which Burton J. held inter alia that where a vessel had suffered damage so that she could not, in effect, carry out the charterers' instructions and could not comply with the commercial purpose of the charter by giving the charterers the trading opportunity to travel to a port where cargo could be loaded and discharged, the vessel was to be regarded as off-hire for such period.

40.     If, which is denied, the vessel did come back on hire on 7th September 2008, **TRC did in any event in fact extend the initial notice of cancellation served on 15th October 2008 up and until 22nd October 2008** (page 49 of the attachments to the Claim Submissions).  The honourable Court will note that this deals with the arguments raised by Swift Splash at paragraphs 36 and 51 of the

9

Petition and at pages 6 and 12-13 of the Memorandum of Law).

41.    If, which is denied, the vessel had come back on hire on 7th September 2008, she would, even on Swift Splash's analysis, have again gone off hire on 21st September 2008 at Ventspils because of her unfitness to load the intended cargo (both because her hatch covers were not watertight and because of the necessity to remove remains of the hardened cement damaged by the ingress of water caused by breakdown or damage to hull or equipment) and the necessity to proceed for repairs.  These took place at Klaipeda and were not completed until 22nd October 2008.

42.    When calculating the earliest time by which the vessel could then have returned on hire, note also has to be taken of Clause 59 of the Charterparty.  This, amongst other things, requires that where time has been lost for *"....Owners' matters...."* which would include the repairs undertaken to the vessel *"hire will remain suspended until the vessel is returned to a point equidistant to the vessel's next destination and voyage resumed therefrom."*

43.    Having travelled from Ventspils to Klaipeda for the repairs, the vessel would not automatically be regarded as on-hire again once the repairs were completed.  Indeed she would not be on hire until she *"returned to a point equidistant to the vessel's next destination and voyage resumed therefrom."*  It is therefore not common ground, contrary to what is alleged in paragraph 28 of the Defence and Counterclaim Submissions, that the vessel came back on hire on 22nd October 2008.  In any event, however, it is submitted that when the extended notice of cancellation was given on 22nd October 2008, the vessel had already been off-hire for a period of more than 30 consecutive days for the purposes of clause 68.

44.    Further and in any event the vessel was off-hire during the period when

10

she deviated to take on board fresh water at Brixham, that period being for Swift Splash's purposes (see clause 59 of the Charterparty) and/or caused by a deficiency of stores or *"any other cause preventing the full use and disposition of the vessel."*

45.   The vessel was off-hire from 22 August 2008 (as is common ground) at the latest and remained off-hire thereafter, TRC having been deprived of her *"full use and disposition"* owing to leaking hatch covers that Swift Splash failed to remedy and/or to hull cleaning carried out by Swift Splash and/or repairs to the vessel's shell plating in Hull.

46.   TRC accept that by 22nd October 2008, the repairs to the vessel's hatch covers had apparently been carried out.  TRC does not accept that the repairs had been carried out successfully.  Nor is it common ground that the vessel went back on hire on 2nd October.

47.   On the facts of the present case, it is self-evident that from at latest 22nd August 2008 until at earliest 22nd October 2008 TRC did not have the *"full use and disposition"* of the vessel given her condition.

**No repudiatory breaches by TRC**

48.   TRC agree that, for clause 68 to apply, the vessel must have been *"off-hire for more than 30 (thirty) consecutive days"*.  This condition was duly fulfilled as demonstrated by the submissions above.

49.   TRC agree that, on 15th October 2008, TRC served a notice of cancellation on Swift Splash pursuant to clause 68 of the Charterparty and/or for Swift Splash's repudiatory breach.

50.   TRC denies that the service of such cancellation notice by TRC was itself a repudiatory breach of the Charterparty. (In any event, even if TRC is wrong, and it was a repudiatory breach, it was in any case not accepted). The vessel had

11

been off-hire since 22nd August 2008.  By 15th October 2008, therefore, the vessel had been off-hire for more than 30 consecutive days and TRC was entitled to serve the notice.

51.     Further and/or alternatively even if, which TRC denies, Swift Splash is correct that the vessel came back on hire on 7th September 2008, she would again have gone off hire on 21st September 2008 on arrival at Ventspils in an unfit condition to load the cargo.  TRC having extended the notice of cancellation up to 22nd October, the vessel would on any analysis have been off hire for more than 30 consecutive days.

52.     TRC confirms that it redelivered the vessel on 22nd October 2008 with immediate effect. TRC was entitled to do so as the vessel had, by that stage, been off-hire for some 2 months or, alternatively, for at least 30 consecutive days.

53.     The honourable Court is requested to note that Swift Splash's contentions at paragraphs 36 and 51 of the Petition and at pages 6 and 12-13 in the Memorandum of Law ignore the fact that the 15th October 2008 notice of cancellation was in any event not accepted (paragraphs 49 and 50 above), and was extended by TRC up to 22nd October (paragraph 51 above).

54.     As at 22nd October 2008 the vessel had been off-hire because of underperformance or unseaworthiness for about 140 days out of the 296 in the year to that date, that is to say for almost half of the time for which she was under charter. During that period TRC suffered losses in excess of US$1.3 million in lost revenue that they would have made in a then ebullient market because of the poor performance of the vessel and deficiencies causing lack of seaworthiness:

(a) In August 2008 the vessel was found to be unseaworthy leading to water damage to her then cargo of cement.  The vessel had a hole or crack in

12

hold number one and/or leaking ballast tanks and the hatch covers were found to be leaking.

(b) On 20th August 2008 the Master refused a request by TRC's agents for the deck and engine logs to enable them to take a copy.

(c) On 29th and 30th August 2008 hose tests were conducted on the hatch covers which were found to leak. Nonetheless the vessel departed from Hull to Portsmouth for hull cleaning before those covers had been repaired either adequately or at all. On 2nd September, the vessel having been off-hire for at least 11 days, Swift Splash informed TRC that the repairs, including repairs to the hatch covers had been performed. In fact they had not, or not adequately; the hatch covers still leaked.

(d) In early September complaints were made that the vessel was not fit to trade and had a long list of deficiencies. On 6th September 2008, following a period of hull cleaning, Swift Splash refused to allow surveyors on board the vessel to inspect the condition of the vessel.

(e) On 15th September, having been ordered to sail to Ventspils in Latvia, the vessel instead proceeded to Brixham to take on fresh water. Sufficient fresh water should have been stemmed by Swift Splash in Hull.

(f) On arrival at Ventspils a hose test was carried out on 21st and 25th September. Only Hold No 3 was found to be watertight. On 27th September Swift Splash informed TRC that they were preparing to move the vessel to a repair facility to make all necessary repairs and upgrades required to ensure the watertight integrity of the hatchcovers, that they estimated that the repairs would take 10 to 15 days but that they could not guarantee that that would be the case.

13

(g) On 30th September 2008 in response to a request to be allowed to inspect the vessel Swift Splash said that they were not prepared to have any charterers or their representatives on board.

55.    All the matters listed at paragraph 54 (a)-(g) above, further particulars of which will be provided following the disclosure stage in the London arbitration, indicate an inability on the part of Swift Splash to perform their obligations under the Charterparty and/or were such as to deprive TRC of substantially the whole benefit for which TRC had contracted, namely the use of a seaworthy vessel during the period of the charter.

56.    TRC denies that TRC elected not to redeliver the vessel or terminate the Charterparty and/or affirmed the Charterparty and/or was estopped from redelivering or terminating whether for the reasons alleged or at all.  TRC plainly did redeliver the vessel and there is no proper basis for contending that it was estopped from doing so.

57.    Swift Splash's reliance on clause 37 of the Charterparty is misconceived. Clause 37 relates to substantiating deductions from hire by original vouchers. It does not relate to circumstances where Charterers do not have the *"full use and disposition"* of the vessel where, by operation of clause 59, *"hire shall be suspended from the time of such event"* without the necessity to supply vouchers or any other documents (which would, in any event, be inapposite to such a situation).

58.    There were discussions between the parties aimed at resolving the situation between 22nd October and 1st December 2008.  Those discussions were unsuccessful and the notice of cancellation/termination given on 22nd October was accordingly not withdrawn and/or was affirmed by TRC.

**Swift Splash's requirement to demonstrate that the amount it seeks from TRC by way of counterclaim exceeds the amount claimed by TRC**

59.     Referring briefly to the third requirement that Swift Splash is required to satisfy (Memorandum of Law, page 9), Swift Splash is unable to demonstrate that the amount it seeks from TRC by way of counterclaim exceeds the amount claimed by TRC.  The vessel would in any event have been incapable of earning 301 days hire before 27th September 2009 (see paragraph 54 above).   The condition of the vessel was such that she would inevitably have been off-hire for substantial parts of that period.  Further particulars will be provided following disclosure in the London arbitration relating to the vessel's employment during the period.  At this stage, however, TRC is able only to make it clear that not only does it not accept Swift Splash's counterclaim, but also, even were the counterclaim to be allowed by the London arbitration tribunal, it does not accept the calculation thereof.  It is therefore not accepted that Swift Splash has legitimate claims for US$4,726,848.99, and not accepted that the quantum of Swift Splash's counterclaim exceeds TRC's claim.

60.     On the basis of the foregoing, I anticipate that the final London arbitration award will be published in TRC's favour.

61.     Swift Splash, the Counter-claimant in the London arbitration, therefore cannot demonstrate to the satisfaction of the honourable Court that it is likely to prevail on the merits.

62.     I accordingly submit that this honourable Court should not issue an order directing the attachment of TRC's assets as requested in Swift Splash's Petition, or at all.  If the Petition were to be granted, notwithstanding Swift Splash's inability to demonstrate a likelihood that it will prevail in the London arbitration, Swift Splash will be in a position to impose settlement terms upon TRC which bear no

relation to the merits of the case which has been referred to London arbitration. This would self-evidently be unjust.

I declare, under the penalty of perjury of the laws of the United States of America, the contents of this declaration are true to the best of my knowledge and belief. I am duly authorised to sign this Declaration on behalf of TRC.

Newcastle, England
Date: 6th day of September, 2010

_____
Clare Fenella Tookey

355543.1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x

SWIFT SPLASH LTD                                    **10-CIV-6448**

                              Petitioner

        against


THE RICE CORPORATION, d/b/a
THE RICE COMPANY

                              Respondent
-----------------------------------------------------------------x


## EXHIBIT A TO THE DECLARATION OF CLARE FENELLA TOOKEY

FROM: T.K.B. SHIPPING A/S - OPERATIONS
DATE: 02-09-2008 11:44:27
REF : NK2078171

To Atlantic Chartering
cc danish defence club attn tkl

Mv Swift Splash/TKB
------------------------

Following received from our subchrts

quote

TO : T.K.B SHIPPING AS THE OWNERS OF MV SWIFT SPLASH
TO : MASTER OF MV SWIFT SPLASH
CC : L DENS SHIPBROKER
FM : TPC KOREA  CO., LTD.

Re :Condition of MV SWIFT SPLASH - urgent and important

Charterers refer to recent correspondence and events. Charterers have
now received the findings of Brown Atkinson Cargo Services Ltd
following the hose test conducted on hatch covers on 29 and 30.8.08.
There was water ingress through the hatch covers of all 5 holds.
However, according to the Master's noon position report for 1.9.08 the
vessel has sailed from Hull for Portsmouth for hull cleaning. There
    been no mention of repairs to hatch covers.

If the hatch covers are in the same condition as found by Brown
Atkinson on the evening of 30.8.08 they are not watertight and the
vessel is unseaworthy. Further, in a Note of Protest issued by Titan
to the Master on 16.8.08 they protested about water damage to cargo
from apparently leaking ballast tanks. Charterers are not aware of any
steps by Owners to investigate and repair this defect.

Charterer's potential further employment of the vessel is compromised
by her current condition and Charterers reserve all of their rights.

Accordingly, Charterers require Owners to immediately provide evidence
which shows the hatch covers and ballast tanks do not leak, or
evidence of the repairs they will perform before the vessel returns to
charter service. This evidence includes but is not limited to the four
categories of evidence set out in Charterer's email of 30.8.08.

The onus is on Owners to show that the vessel is in the condition as
warranted in the charterparty and is fit for charter service. Once
Owners have supplied this information it may also be appropriate for
Charterers to send their own surveyor onboard to inspect the conditon
of the vessel. This may include hose / ultrasonic testing of the hatch
covers to test their water tight integrity, and testing the water
tight integrity of the ballast tanks. Further it may be necessary to

obtain steel thickness readings as to establish the vessel is fit for
further employment. We request Owners written confirmation they agree
to such inspection by Charterers surveyor at Portsmouth BY RETURN.

Charterers await Owners response and in the meantime reserve all of
their rights.

Best regards / D. P. Lim - legal dept.

unquote

please advise

best regards
niels klaris
for t.k.b shipping a/s
ph +45 3946 3646
fax +45 3946 3650
mob +45 4042 0434
email operations@tkb.dk

RD1

to atlantic chartering

urgent urgent

re swift splash - tkb
----------------------

following received from subcharterers

quote

charterers understand from owners the hull cleaning being undertaken
in the portland area will conclude on sunday next. however, charteres
have received no proof from owners the vessel is in a fit condition to
continue charter service. the relevant facts include the following,

1. the hatch covers leaked and caused damage to the cement cargo
onboard during the recent voyage to hull.

2. on completion of repairs to the hatch covers at hull the hatch
covers for each hold were hose tested on 29 and 30 august and each
hatch cover still leaked.

3. the ship sailed from hull on 1 septemeber and since then owners
have only referred to cleaning the hull, and have not established if
there have been further repairs to the hatch covers or if they are now
watertight. numerous defects in the hatch covers were noted by
charterers surveyors during their attendance onboard last weekend.

4. whilst the vessel was at hull corrosion holes were noted in the
port side shell plate.

5. also whilst at hull a protest was issued by titan cement uk to the
master in respect of apparently leaking ballast tanks.

6. port state control attended onboard the vessel in hull and listed
'efects including;

a) loadline items for ventilators, air pipes and casings,
b) structural safety items for deck corrosion, emergency lighting,
batteries and switches, and other safety in general,
c) other items including safety of navigation.

7. on 30 august and again since charterers have requested information
and documents from owners to castablish the vessel is in a fit
condition to trade. the information has not been supplied by owners
and owners have specifically refused to allow charterers to send a
surveyor onboard to take thickness readings.

in the circumstances the charterers have no way of knowing if the
vessel is fit to trade. charterers reserve all of their rights
including but not limited to treat the vessel as off hire until owners
establish the vessel is fit to trade.

further, owners will be aware that charterers can obtain an order from
the english high court permitting them to send a surveyor onboard the
establish the vessel's current condition. this will be to establish if
.e vessel is fit to trade, and if it is not if charterers can
terminate the charterparty. if charterers have to make such an
application they will ask the court to order that thickness readings
are taken of relevant structures, and which will include hull and deck
plating, ballast tanks, hatch covers, ventilators, air pipes and
casings. accordingly charterers request owners immediate cooperation
and constructive reply by 1500 hrs london today, and in the meantime
reserve the right to bring all this correspondence to the attention of
the court.

b.rgds

tpc korea co., ltd.

unquote

RD2

Subject: MV SWIFT SPLASH/ TPC –

TO : LDENS
FM : TPC

We refer to recent correspondence and to the application made by our solicitors to the English High Court for inspection of the vessel. The judge did not grant the order we requested, but he indicated the vessel is clearly in poor condition and requires repair, and that we could inspect when the repairs are undertaken. Accordingly we request to be given notice by Owners of any repairs they intend to carry out, other than minor temporary repairs, and we request the opportunity to inspect the vessel at that time. In the meantime the Judge gave us leave to renew our application to court if it is necessary to do so, and we intend to re-apply to court if we do not receive your cooperation.

In the meantime, it is not clear to us whether the vessel can carry water sensitive cargo or is restricted to non water sensitive cargo such as scrap? In these circumstances we are looking to fix the vessel for any cargo as permitted under the charterparty, including water sensitive cargo, and we intend to conduct a hose test of the hatch covers, which Owners have now consented to, at the next loadport. However, if Owners consider this is inappropriate for any reason please would they clarify the position by return.

In the meantime, please advise if hull cleaning has been completed and if the vessel is ready to sail to the next loadport?

B.rgds/Min
******************************
A. MANAGER/HANDY TEAM 2
TPC KOREA CO., LTD.
10FI.,DONGHWA BLDG., 58-7,
SEOSOMUN-DONG, JUNG-KU,
SEOUL, KOREA
TEL : +82-2-775-5888(REP)
        +82-2-2022-3433(DIR)
FAX : +82-2-775-7444
MOB : +82-10-3152-2755
EMAIL : handy@tpckr.com
            min@tpckr.com
******************************

RD 3

**Subject:** Re: SWIFT SPLASH

MV Swift Splash - c/p dd 11.7.08

As you are aware the vessel is currently fixed to load urea at
Ventspils. The vessel's hatch covers were hose tested today and leakages
were found in four holds, nos. 1,2,4 and 5. These hatch covers are not
watertight and are not able to protect the cargo against water ingress
in the ship's normal operational conditions. Accordingly Owners are in
breach of charter as the ship is unseaworthy.

Further, there is an apparent failure by Owners to comply with their
maintenance obligations under the charter. The vessel was previously
hose tested on about 29 and 30th August at Hull and the hatch covers
leaked. At the hearing in the English High Court on 9.9.08 the Judge
took the view then that repairs were necessary and said that at that
time Owners were in breach of charter "by a long way". Since the hatch
covers continue to leak it is reasonable to assume that Owners have
failed to repair the hatch covers in the meantime and which is a breach
of their maintenance obligations.

TPC reserve all their rights arising from Owner's breaches of charter,
and require Owners to confirm by return whether or not they will repair
the hatch covers so they are watertight and the ship is seaworthy, and
if so when this will be? This information is required so that Charterers
can know if the vessel can perform the urea fixture or if it can be
employed any further at all under the charter.

Owners will appreciate time is of the essence in view of the urea
fixture for the vessel, and Charterers give notice that they reserve the
right to claim any losses or damages they incur if that fixture is not
performed by the vessel by reason of Owner's breaches of charter.

As requested above, Charterers require Owners answers and information BY
RETURN.

RD4

from:    FRACHTCONTOR JUNGE & CO., HAMBURG  -  DRYCARGO DEPT.
PHONE +49 40 3000-0    FAX +49 40 3000-343
E-MAIL: handy@frachtcontor.de
INTERNET: www.frachtcontor.com

Doc-No. 5181021  26/SEP/2008  15:13 (UTC +0200) MW

simon/michael


just rcvd:



RE: MV SWIFT SPLASH / HELM



PLS FIND BELOW RCVD FRM CHRTS:




QTE:


Re - M/V SWIFT SPLASH
----- Helm C/P dtd. 16.09.2008

Ref. a.m. subject, plse note that we herewith cancel the above mentioned
Charter Party.

Plse inform Owners immediately.

Thks and rgds/HDG-Shipping



UNQTE.




BRGDS

RD 5

--------------------------------------
Frachtcontor Junge & Co. GmbH - Registered in Hamburg - HRB 78524
Managing Directors: Hans L. Akkermann, Dr. Martin Roettig
We are working exclusively on the basis of German law and the General Business
Conditions of the Association of German Shipbrokers (obtainable on request)
which may be viewed at www.frachtcontor.com - Place of Jurisdiction: Hamburg
EN ISO 9001:2000 certified

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------x

SWIFT SPLASH LTD                                                    **10-CIV-6448**

                              Petitioner

        against


THE RICE CORPORATION, d/b/a
THE RICE COMPANY

                              Respondent

-------------------------------------------------------------------x


**<u>EXHIBIT B TO THE DECLARATION OF CLARE FENELLA TOOKEY</u>**

| M/V SWIFT SPLASH | | | | | |
|---|---|---|---|---|---|
| C/P dtd 05/SEPT/2007 | | | | | |
| | | | | | |
| HIRE: | | | Dr | | Cr |
| START: DATE/TIME | 27/09/2007 13:00 | | | | |
| END: DATE/TIME | 11/22/08 17:12 | | | | |
| DURATION: | 391.18 | | | | |
| DAILY T/C RATE | $21,000.00 | | | | $8,214,675.00 |
| | | | | | |
| MDO overconsumption | 9/27/07 15:00 – 10/2/07 05:00 | 2.82 | $1,833.00 | | |
| | | | | | |
| Underperformance | | | | | |
| 10/2/07 13:00-10/5/07 16:30 | 1.66 | | | | |
| DAILY T/C RATE: | $21,000.00 | | $34,912.50 | | |
| MDO over consumption | 1.22 | $650.00 | $793.00 | | |
| Off Hire | | | | | |
| START: DATE/TIME | 10/5/07 16:30 | | | | |
| END: DATE/TIME | 11/11/07 17:30 | | | | |
| DURATION: | 6.04 | | | | |
| DAILY T/C RATE: | $21,000.00 | | $126,875.00 | | |
| IFO: (MT) 380 off hire 326-302 | 24.000 | $325.00 | $7,800.00 | | |
| MDO off hire 76.5-47.2 | 29.300 | 650.00 | $19,045.00 | | |
| Time for bunkering | | | | | |
| START: DATE/TIME | 10/17/07 19:00 | | | | |
| END: DATE/TIME | 10/17/07 22:30 | | | | |
| DURATION: | 0.15 | | | | |
| DAILY T/C RATE: | $21,000.00 | | $3,062.50 | | |
| MDO purchase difference in $$ | 40.000 | $49.00 | $1,960.00 | | |
| | | | | | |
| Underperformance | | | | | |
| START: DATE/TIME | 10/11/07 5:30PM | | | | |
| END: DATE/TIME | 10/17/07 9:30 AM | | | | |
| DURATION: | 0.43 | | | | |
| DAILY T/C RATE: | $21,000.00 | | $8,925.00 | | |
| MDO overconsumed | $0.95 | $650.00 | $617.50 | | |
| Detention at Ringaskiddy | | | | | |
| START: DATE/TIME | 12/1/07 15:05 | | | | |
| END: DATE/TIME | 12/6/07 16:45 | | | | |
| DURATION: | 5.07 | | | | |
| DAILY T/C RATE: | $21,000.00 | | $106,458.33 | | |
| MDO off hire 2 mt as per cp | 9.00 | $650.00 | $5,850.00 | | |
| Off hire - @ - Rotterdam | | | | | |
| START: DATE/TIME | 12/12/07 2:15 | | | | |
| END: DATE/TIME | 12/12/07 23:40 | | | | |
| DURATION: | 5.89 | | | | |
| DAILY T/C RATE: | $21,000.00 | | $123,739.58 | | |
| MDO off hire | $17.90 | $650.00 | $11,635.00 | | |
| IFO off hire | | | | | |
| | | | | | |
| Off hire - @ - Police | | | | | |
| START: DATE/TIME | 12/21/07 11:00 | | | | |
| END: DATE/TIME | 12/24/07 15:00 | | | | |
| DURATION: | 3.17 | | | | |

| | | | | | |
|---|---|---|---|---|---|
| Commission: Address com | 3.75% | | $308,050.31 | $3,155,719.51 | $118,339.48 |
| Commission: Broks com | 1.25% | | $102,683.44 | | $39,446.49 |
| | | | | | |
| REPR/CABLES | | | | | |
| REPR/CABLES (L/SUM): | 391.18 | $1,250.00 | | | $16,298.96 |
| CVE off hire | 140.90 | $1,250.00 | $6,685.54 | | |
| BUNKERS ON DLY: | | | | | |
| IFO: (MT) 380 | 319.000 | $325.00 | | | $103,675.00 |
| MDO: (MT) | 54.800 | $650.00 | | | $35,620.00 |
| | | | | | |
| BUNKERS ON RDLY: | | | | | |
| IFO: (MT) 380 | 553.000 | $325.00 | $179,725.00 | | |
| MDO | 15.200 | $650.00 | $9,880.00 | | |
| | | | | | |
| ILOHC | | | | | $16,750.00 |
| | | | | | |
| Owners expenses | costs | 2.50% | | | |
| Expenses at Las Palmas | | | $347.44 | | |
| At Ringaskiddy (apprvd 5/20) | | | $3,461.00 | | |
| New Amsterdam | | | $1,193.19 | | |
| | | | | | |
| CHRTS PAYMENTS: | | 04-Oct | $439,170.00 | | |
| | | 12-Oct | $106,958.50 | | |
| | | 29-Oct | $299,875.00 | | |
| | | 10-Nov | $299,875.00 | | |
| | | 26-Nov | $269,443.38 | | |
| | | 10-Dec | $173,131.46 | | |
| | | 14-Dec | $299,875.00 | | |
| | | 10-Jan | $152,071.10 | | |
| | | 25-Jan | $299,736.46 | | |
| | | 09-Feb | $299,875.00 | | |
| | | 28-Feb | $299,875.00 | | |
| | | 07-Mar | $299,875.00 | | |
| | | 25-Mar | $39,983.33 | | |
| | | 29-Mar | $259,891.67 | | |
| | | 24-May | $173,467.89 | | |
| | | 09-Jun | $299,875.00 | | |
| | | 23-Jun | $299,875.00 | | |
| | | 07-Aug | $234,252.02 | | |
| | | 22-Aug | $299,875.00 | | |
| | | 06-Sep | $249,945.38 | | |
| | | | $9,428,532.20 | | $8,544,804.90 |
| Due to Charterers | | | $883,727.30 | | |
| | | | $8,544,804.93 | | $8,544,804.90 |
| | | | | | |
| | | | | | |

P:\Swift Splash (11691)\Revised Final Hire Statement.docx

| | | | | | |
|---|---|---|---|---|---|
| DAILY T/C RATE: | $21,000.00 | | $66,500.00 | | |
| MDO off hire | $7.90 | $650.00 | $5,135.00 | | |
| IFO off hire | | | | | |
| | | | | | |
| Off hire - @ - Lome (at port) | | | | | |
| START: DATE/TIME | 1/17/08 2:15 | | | | |
| END: DATE/TIME | 1/29/08 9:00 | | | | |
| DURATION: | 8.95 | | | | |
| DAILY T/C RATE: | $21,000.00 | | $187,950.00 | | |
| MDO off hire | 22.38 | $650.00 | $14,543.75 | | |
| IFO off hire | | | | | |
| | | | | | |
| Off hire - @ - Lome (at roads) | | | | | |
| START: DATE/TIME | 2/12/08 17:35 | | | | |
| END: DATE/TIME | 2/14/08 14:00 | | | | |
| DURATION: | 1.85 | | | | |
| DAILY T/C RATE: | $21,000.00 | | $38,864.58 | | |
| MDO off hire | 3.70 | $650.00 | $2,405.00 | | |
| IFO off hire | | | | | |
| | | | | | |
| Off hire - @ - Savannah (dschg) | | | | | |
| START: DATE/TIME | 3/11/08 20:20 | | | | |
| END: DATE/TIME | 3/28/08 7:35 | | | | |
| DURATION: | 16.47 | | | | |
| DAILY T/C RATE: | $21,000.00 | | $345,843.75 | | |
| MDO off hire | 36.00 | $1,190.00 | $42,840.00 | | |
| IFO off hire | | | | | |
| | | | | | |
| Off hire - @ - Savannah (repairs) | | | | | |
| START: DATE/TIME | 4/10/08 16:00 | | | | |
| END: DATE/TIME | 4/29/08 10:00 | | | | |
| DURATION: | 18.75 | | | | |
| DAILY T/C RATE: | $21,000.00 | | $393,750.00 | | |
| MDO off hire | 26.00 | $1,161.00 | $30,186.00 | | |
| IFO off hire | 34.90 | $500.00 | $17,450.00 | | |
| | | | | | |
| Off hire - @ - Napoli (repairs) | | | | | |
| START: DATE/TIME | 6/23/08 3:20 | | | | |
| END: DATE/TIME | 7/25/08 16:30 | | | | |
| DURATION: | 32.55 | | | | |
| DAILY T/C RATE: | $21,000.00 | | $683,520.83 | | |
| MDO off hire | 12.90 | $1,150.00 | $14,835.00 | | |
| IFO off hire | 0.00 | $- | $- | | |
| | | | | | |
| Underperformance after Napoli | | | | | |
| START: DATE/TIME | | | | | |
| END: DATE/TIME | | | | | |
| DURATION: | 2.06 | | | | |
| DAILY T/C RATE: | $21,000.00 | | $43,329.93 | | |
| MDO off hire | 4.60 | $725.00 | $3,335.00 | | |
| IFO off hire | 8.15 | $500.00 | $4,075.00 | | |
| | | | | | |
| Off hire - @ - Hull/Portland/Ventspils | | | | | |
| START: DATE/TIME | 8/22/08 14:00 | | | | |
| END: DATE/TIME | 10/22/08 17:12 anchored Klaipeda roads after repairs | | | | |
| DURATION: | 61.133 | | | | |
| DAILY T/C RATE: | $21,000.00 | | $1,283,793.00 | | |
| MDO off hire (estimated) | | $650.00 | $54,502.50 | | |
| IFO off hire (estimated) | | $325.00 | $33,215.00 | | |
| | | | | | |
| Commission | | | | | |

# EXHIBIT 2

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------X
SWIFT SPLASH LTD.,

                              **10 Civ 6448 (JGK)**

              *Petitioner,*

     -against-

THE RICE CORPORATION, d/b/a
THE RICE COMPANY

              *Respondent.*
-------------------------------------------------------X

## DECLARATION OF MANISH BHAPKAR

Manish Bhapkar declares under penalty of perjury under the laws of the United States as follows:

1.      I am a chartering and freight manager for The Rice Corporation doing business as The Rice Company ("The Rice Company"). I make this declaration in support of the opposition of The Rice Company to the petition by Swift Splash Ltd. seeking an attachment in aid of arbitration.

2.      I manage freight and vessel logistics on behalf of The Rice Company. Since 2003, The Rice Company has chartered, on average, approximately 150 vessels per year ranging from 20,000 metric tons DWT to 70,000 metric tons DWT, placing it among the world's largest and most substantial chartering and vessel freight companies. In the years 2007 to 2010 alone, The Rice Company chartered an average of 115 vessels

per year.  It enjoys a reputation as one of the most substantial vessel chartering businesses in the world, and is actively engaged in the vessel chartering and freight business.  Petitioner's allegations in this action that The Rice Company may disappear, hide assets or otherwise evade any obligations in connection with the present charter party dispute are completely unfounded and consist of a less than candid characterization of The Rice Company before this Court.

3.     The Rice Company paid an average of $153 million **per year** for vessel freight and hire from 2007-2010.

4.     The Rice Company paid approximately $20 million for Forward Freight Agreements (FFAs) during 2008 when the entire market collapsed by more than 100% based on contract prices during the financial crisis of 2008.  This catastrophic failure in the FFA market caused virtually every counterparty to default, resulting in numerous maritime attachments, many of which were brought in this District.  The Rice Company was a party to these attachment proceedings, both as a defendant and as a party seeking attachment.  The Rice Company honored all of its commitments under every FFA to which it was a party, and settled every account, when other vessel operators and chartering companies refused to perform or went bankrupt.

5.     In addition, The Rice Company paid approximately $17 million for a physical forward position in bunkers during 2008 and 2009 even though the bunker fuel

market dropped over 150% in value based on contract prices. Again, The Rice Company fulfilled all of its obligations when other companies did not.

6.     Given the large number of cargoes moved by The Rice Company and the large number of charter parties entered into, it is not unusual for The Rice Company to have disputes with vessel owners and sub-charterers that are resolved amicably or that result in arbitration proceedings. Charter party disputes, cargo claims and arbitrations are simply a fact of life in this business. Every vessel owner and charterer that engages in the high volume of business such as The Rice Company invariably will find itself in charter party disputes. The Rice Company is the party which initiated arbitration due to petitioner's breach of the charter party. Petitioner now is attempting to gain a tactical advantage by initiating an attachment proceeding in this jurisdiction after arbitration between the parties has been pending in London for over a year.

7.     The Rice Company is presently involved in three arbitrations in London which we are actively prosecuting. In none of those arbitrations have the parties sought to attach funds. All other prior disputes in which The Rice Company has been a party have been settled. At no time has The Rice Company ever failed to pay any monies due to another party as a result of a settlement or arbitration award.

8.     The Rice Company has been in business since 1991 and has fully paid and honored all of its contracts and obligations for the past 19 years. Despite the market collapse in 2008-2009 and during a time when many companies were declaring

bankruptcy and defaulting on their payments, The Rice Corporation has honored, and will continue to honor, all of its financial commitments down to the last penny.

9.     The Rice Company is qualified to do business in the State of New York, and maintains an office at 80 Broad Street, 5th Floor, New York, NY 10004.  Its telephone number in New York is (212) 837-7900.

I declare the foregoing to be true under the penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on September 7, 2010.

MANISH BHAPKAR

# EXHIBIT 3

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------X

DAEYANG SHIPPING CO. LTD.,          :

           Plaintiff,          :

  - against -          :

THE RICE CORPORATION, trading as    :
THE RICE COMPANY,

           Defendant.          :
------------------------------------------------------X

08 CV 9819 (CM)
ECF CASE

USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 2/17/09

### STIPULATION AND TURN OVER ORDER
### IN RESPECT OF ATTACHED PROPERTY

    IT IS HEREBY STIPULATED AND AGREED between the parties, by their undersigned

attorneys, as follows:

    WHEREAS the Plaintiff, DAEYANG SHIPPING CO. LTD., ("Plaintiff"), and the

Defendant, THE RICE CORPORATION, trading as THE RICE COMPANY, ("Defendant"),

have agreed to settle the disputes between them pursuant to issues related to Forward Freight

Agreements and alleged breaches thereof, which resulted in Plaintiff filing this action against the

Defendant seeking an order from this Court directing the Clerk of Court to issue Process of

Maritime Attachment and Garnishment pursuant to Rule B of the Supplemental Rules for Certain

Admiralty and Maritime Claims; and

    WHEREAS the parties have entered into a private and confidential settlement agreement

that provides the terms and conditions by which the settlement agreement shall be effected; and

    WHEREAS garnishees JP Morgan Chase, Citibank, Bank of New York, Deutsche Bank,

and the Bank of America acting pursuant to the Ex Parte Order of Maritime Attachment and the

Process of Maritime Attachment and Garnishment, restrained and attached the RICE

COMPANY'S property, *i.e.* electronic funds transfers that named RICE COMPANY as either the originator or beneficiary, in the total amount of USD $2,358,452.20; and

WHEREAS the parties have agreed that the RICE COMPANY will fund USD $2,358,452.20 of the settlement from the funds currently under attachment; and

WHEREAS the parties have agreed that the total amount of USD $2,358,452.20 of the RICE COMPANY'S attached funds should be released by JP Morgan Chase, Citibank, Bank of New York, Deutsche Bank, and the Bank of America to DAEYANG in a bank account with details to be provided by the Plaintiffs' undersigned attorney; and

WHEREAS the parties have agreed that after DAEYANG has received the USD $2,358,452.20 into its account, the parties shall then prepare and file a stipulation of dismissal that provides for the dismissal of this action with prejudice;

IT IS HEREBY ORDERED that garnishees JP Morgan Chase, Citibank, Bank of New York, Deutsche Bank, and the Bank of America shall effect an electronic funds transfer in favor of DAEYANG in the amount of USD $2,358,452.20, which amount shall be deducted from the RICE COMPANY property that JP Morgan Chase, Citibank, Bank of New York, Deutsche Bank, and the Bank of America currently hold under attachment, and that JP Morgan Chase, Citibank, Bank of New York, Deutsche Bank, and the Bank of America shall pay this amount to DAEYANG at an account to be specified by their undersigned attorney and that any bank fees associated with the transferring of the settlement funds to the DAEYANG account shall not be deducted from the transferred funds; and

-2-

IT IS FURTHER HEREBY STIPULATED AND ORDERED that the USD $2,358,452.20 payment from the RICE COMPANY to DAEYANG shall not be subject to any attachment by DAEYANG or any other party in New York;

IT IS FURTHER HEREBY STIPULATED AND ORDERED that once DAEYANG has received the amount of the settlement funds that are currently under attachment as herein described in the amount of USD $2,358,452.20, the Parties shall then file a Stipulation of Dismissal with prejudice and without costs to any party.

Dated: February 11, 2009

The Plaintiff,
DAEYANG SHIPPING CO. LTD.,


By _____
Claurisse Campanale Orozco (CO 3581)
Thomas L. Tisdale (TT 2162)
TISDALE LAW OFFICES, LLC
24 West 40th Street, 17th Floor
New York, NY 10018
(212) 354-0025 – phone
(212) 869-0067 – fax
corozco@tisdale-law.com
ttisdale@tisdale-law.com

The Defendant,
THE RICE CORPORATION, trading
as THE RICE COMPANY,


By: _____
Adam Brown, Esq.
BROWN & ASSOCIATES
11140 Fair Oaks Boulevard, Suite 100
Fair Oaks, CA 95628
(916) 859-4910 – phone
(916) 859-4911 - fax
adam@brnlaw.com


SO ORDERED:


_____
Honorable Colleen McMahon, U.S.D.J.

2 -17 - 09

-3-

Daeyang Shipping Co. Ltd. v. The Rice Corporation 08 CV 9189 (CM)

**Subject:** Daeyang Shipping Co. Ltd. v. The Rice Corporation 08 CV 9189 (CM)
**From:** "Leah Black" <LBlack@tisdale-law.com>
**Date:** Wed, 11 Feb 2009 16:51:19 -0500
**To:** <orders_and_judgments@nysd.uscourts.gov>
**CC:** "Claurisse A. Campanale-Orozco" <COrozco@tisdale-law.com>, <adam@brnlaw.com>

**RE:**   **Daeyang Shipping Co. Ltd. v. The Rice Corporation, trading as The Rice Company**
Docket Number: 08 CV 9819 (CM)
Our File No.: 08-2062

Dear Sir or Madam:

   We represent the Plaintiff, Daeyang Shipping Co. Ltd., in the above-captioned matter. Please find attached a ***Stipulation and Turn Over Order in Respect of Attached Property***, signed by the parties' counsel, with Order for submission to the Hon. Judge McMahon in regards to same.

   We kindly request that the document be submitted to the Court for approval as soon as possible. Should you have any questions concerning the enclosed, please feel free to contact the undersigned, or counsel Claurisse Campanale-Orozco, (reading in copy herein).

   Thank you for your attention to the foregoing.

Kind regards,

Leah Black
Leah J. Black | Legal Assistant
TISDALE LAW OFFICES, LLC
New York, NY | ◦ | Southport, CT
lblack@tisdale-law.com

** ATTENTION: We've Moved! Please note the change in address for our New York office. **
24 West 40th Street | 17th Floor | New York | 10018
T: 212.354.0025 | F: 212.869.0067
10 Spruce Street | Southport | Connecticut | 06890
T: 203.254.8474 | F: 203.254.1641
Please visit our website at www.tisdale-law.com

NOTICE: THIS EMAIL IS BEING SENT BY A LEGAL REPRESENTATIVE.
This email and any attachments thereto, is intended only for use by the addressee(s) named herein and may contain legally privileged and/or confidential information. If you are not the intended recipient of this email, you are hereby notified any dissemination, distribution or copying of this email, and any attachments thereto, is strictly prohibited. If you receive this email in error please immediately notify me at (212)-354-0025 and permanently delete the original copy and any copy of any email, and any printout thereof.

| | |
|---|---|
| **Signed Stipulation and Turn Over Order 08 cv 9819.pdf** | **Content-Description:** Signed Stipulation and Turn Over Order 08 cv 9819.pdf |
| | **Content-Type:** application/octet-stream |
| | **Content-Encoding:** base64 |